URR V. TWC 



IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN




 





NO. 3-90-209-CV





UNITED RESOURCE RECOVERY, INC.,



 APPELLANT


vs.





TEXAS WATER COMMISSION, ET AL.,



 APPELLEES



 




FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT



NO. 474,017, HONORABLE JERRY DELLANA, JUDGE 



 




 The Texas Water Commission ("the Commission"), issued an
order denying six applications for permits that would authorize
United Resource Recovery, Inc. ("URR") to operate a hazardous waste
disposal facility utilizing injection wells. URR sued the
Commission in district court for judicial review of the order. The
district court affirmed the order and URR has appealed to this
Court. We will affirm the judgment.



BACKGROUND



 URR proposed to construct a hazardous waste disposal
facility with two components:  (1) a surface facility where liquid
hazardous wastes are blended with fly ash and a secret catalyst
(F2S) to create a slurry; and (2) leached-out caverns in the Boling
Salt Dome into which the hazardous waste slurry is injected for
storage.

 In August 1983, URR filed six applications for the
following permits: (1) a hazardous waste permit required to
operate a surface facility pursuant to the Texas Solid Waste
Disposal Act, Tex. Health & Safety Code Ann. §§ 361.001-361.345
(1990); (2) four injection well permits required for solution
mining and hazardous waste injection pursuant to Tex. Water Code
Ann. §§ 27.001-27.105 (1988 & Supp. 1991); and (3) one water
quality discharge permit required for discharge into waters from a
surface stormwater collection system and retention pond pursuant to
the Tex. Water Code Ann. §§ 26.001-26.407 (1988 & Supp. 1991). 
Because URR needed all six permits to operate the proposed waste
disposal facility, the Commission consolidated the permit hearings. 
See 31 T.A.C. § 263.20 (19--) (the Commission may consolidate
related matters if it will not injure any party and will benefit
the public interest.) After holding an evidentiary hearing in
1986, the Commission voted to approve the applications. 

 Several protestants sued in district court for judicial
review of this decision. The district court dissolved the
Commission's order because it was not final; URR had failed to
demonstrate the financial assurance to secure its obligation to
plug the wells and properly close the surface facility. See
Browning-Ferris Inc. v. Brazoria County, 742 S.W.2d 43, 54 (Tex.
App., 1987, no writ).

 When URR submitted financial assurance instruments in May
1988, the Commission approved the permit applications for the
second time. The protestants again brought suit in district court. 
This time the district court nullified the order because the
Commission failed to reopen the evidentiary hearing to consider the
adequacy of the financial assurance instruments and failed to adopt
a finding that URR had made a satisfactory showing of financial
assurance. 

 The applications were again before the Commission in 
1989. Chairman Wynne, a Commission member who had not participated
in the earlier considerations of the applications, stated that he
would consider the merits of the proposed waste disposal facility,
as well as the adequacy of URR's financial assurance. Wynne also
asked the public-interest advocate, as a party to the hearing, to
prepare a report considering the need for, the viability of, and
the benefit conferred on the public by the proposed operation. 

 The report of the public-interest advocate urged the
Commission to deny the injection well permits because URR had
failed to demonstrate that fresh groundwater could be protected
from potential pollution resulting from the hydrologic and
structural instability of the Boling Salt Dome. The Commission
held an evidentiary hearing and in August 1989 issued an order 
denying all six permit applications because URR had failed to show
that groundwater would be protected by proper safeguards if the
slurry were deposited in the proposed injection wells. 

 URR combines its first two points of error complaining
that the Commission acted in an arbitrary and capricious manner by
failing to adopt sufficient underlying findings of fact to support
the denial of the injection well permits, and failed to adopt
separate findings of fact to support the denial of the hazardous
waste and water quality discharge permits. See APTRA § 19(e)(6). 
In its third point of error URR attacks the order as not supported
by substantial evidence. In points of error four and five URR
complains that the Commission measured the permit applications
against a new standard for solidification at the evidentiary
hearing and failed to give proper notice that the new standard
would replace the former "paint filter test." See APTRA
§ 19(e)(5). We now address appellant's first three points of
error.


 FINDING OF FACT NO. 17
 


 In response to URR's first point of error, we review the
sufficiency of the Commission's findings under section 16(b) of the
Administrative Procedure and Texas Register Act, Tex. Rev. Civ.
Stat. Ann. art. 6252-13(a) (1991) ("APTRA"). Section 16(b)
requires the Commission to issue a final decision that includes
separately stated findings of fact and conclusions of law. 
"Findings of fact, if set forth in statutory language, must be
accompanied by a concise and explicit statement of the underlying
facts supporting the findings." APTRA § 16(b). Proper underlying
findings of fact should be "clear, specific, non-conclusory, and
supportive of the ultimate statutory finding." Texas Health
Facilities Comm'n v. Charter Medical-Dallas, 665 S.W.2d 446, 452
(Tex. 1984). They should not be mere recitals of testimony or
summations of the evidence. Id. 

 The Texas Water Code sets forth the statutory criteria
the Commission must consider before it issues an injection well
permit. The Commission must find that the applicant will use
proper safeguards to adequately protect fresh ground and surface
water from pollution. Tex. Water Code Ann. § 21.051(a)(3) (1988). 
The Commission addressed this requirement in finding of fact number
17 ("Finding No. 17"), which it phrased as an ultimate finding of
fact set forth in statutory language: 


 Section 27.051(3) [sic] provides that the Commission may
grant an application and issue a permit if, with proper
safeguards, fresh groundwater can be protected. However,
there is not a preponderance of evidence in the record
that groundwater can be adequately protected.


Following the mandate in APTRA § 16(b), the Commission provided
seventeen underlying or sub-findings of fact to support this
ultimate finding of fact. 

 There is no precise form in which an agency must
articulate its underlying findings. Goeke v. Houston Lighting &
Power Co., 797 S.W.2d 12, 15 (Tex. 1990). Moreover, the reviewing
court may not subject the agency's order to some "hypertechnical
standard of review." Id., citing, State Banking Board v. Allied
Bank Marble Falls, 748 S.W.2d 447, 449 (Tex. 1988). We require
underlying findings of fact to ensure a serious appraisal of the
facts by an agency. Id. at 452. Additionally, we must determine
if the underlying findings inform the parties and the courts of the
basis for the Commission's decision so that the parties may
intelligently prepare an appeal and the courts may properly
exercise their review function. Id. at 449.

 In sub-findings of fact 17(a)-(q, the Commission found
that URR did not meet its burdin of proving that:


 * the secret mixing compound, F2S, would properly 
solidify the hazardous waste


 * the slurry would effectively pour into the salt
caverns and solidify after reaching the cavern
bottom


 * that the slurry would maintain proper contact with
the salt cavern walls to avoid disturbances
affecting permeability.



The Commission further found that URR had not tested the mixture
thoroughly enough to predict long-term effects.

 

 


 * determine the amount of hazardous waste, if any,
that would remain available to the environment


 * to demonstrate the use of kiln dust as an
alternative to fly ash in the mixing procedure.



 The Commission also found that persons with a financial
interest in the operation conducted the scientific studies on the
special catalyst's character and performance. This reflected the
Commission's concern about the weight to be given to the testimony
of URR's expert witnesses. The Commission also found that fresh
water existed in aquifers located above the proposed caverns. 
These aquifers would be at risk for pollution if the well-casings
cracked or were severed during injection.


 

 We conclude that the sub-findings of fact supporting
Finding No. 17 are clear and specific; they contain material facts
related to the Commission's statutory duty to protect groundwater. 
The underlying findings reflect the Commission's concern about the
bias of the expert testimony, and the inadequate testing of the
slurry, and the integrity of the salt formation. Moreover they
specifically reflect the Commission's concern about the facility's
threat to nearby groundwater. We conclude that the underlying
findings satisfy the requirements of APTRA § 16(b) and that,
therefore, the Commission's actions were not arbitrary and
capricious. We overrule the first point of error.



SUBSTANTIAL EVIDENCE



 In its third point of error, URR complains that the
Commission did not base its order on the substantial evidence in
the record. URR only attacks Finding No. 17. When conducting a
substantial evidence review we must determine whether the record
contains some reasonable basis for the Commission's action. 
Charter Medical, 665 S.W.2d at 452. 

 Charter Medical directs us to ask two questions in
reviewing for substantial evidence: (1) Do the findings of
underlying fact stated in the order fairly support the Commission's
findings of ultimate fact or conclusions of law, stated as the
basis of the agency decision; and (2) do the findings of underlying
fact find reasonable support in the evidence adduced in the agency
proceeding? Texas State Board of Pharmacy v. Seely, 764 S.W.2d
806, 813 (Tex. App. 1988, writ denied). If we can answer both
questions affirmatively, we will uphold the Commission's order as
supported by substantial evidence. 

 The Commission phrased Finding No. 17 as an ultimate fact
by stating the statutory criteria to protect groundwater. See
Powers, Judicial Review of the Findings of Fact Made by Texas
Administrative Agencies in Contested Cases, 16 Tex. Tech L. Rev.
475, 478 (1985). The Commission then based conclusions of law
numbers three and four on Finding No. 17. The underlying findings
of fact explain that there was only speculative evidence of the
effectiveness of the catalyst, F2S, and the rate at which the
slurry would solidify. URR could not guarantee that the slurry
would maintain proper contact with the cavern walls. The findings
set forth that the salt dome was structurally unstable and that
dynamite might be used to remove oil well casings in the salt dome. 
Additionally, two aquifers were located above the dome near the
proposed site of the injection wells. We conclude that the sub-
findings of fact 17(a)-(q) fairly support the Commission's ultimate
finding that URR did not prove that it could adequately protect
groundwater if the injection well permits were issued. These
findings also support the Conclusion No. 3 that the URR's proposed
methodology for solidification of the hazardous waste presented a
threat to fresh groundwater and Conclusion No. 4 that the
Commission should not issue the injection well permits. The order
passes the first portion of the Charter Medical test.

 The sub-findings which address the catalyst's ability to
create a slurry, the problems related to pouring the slurry, the
possible mounding of the slurry in the salt caverns, and the
inadequate testing of the slurry, are all based on the testimony of
the following witnesses: (1) L.T. Fan, a co-founder of the
catalyst, F2S, and URR's expert in chemical engineering; (2) Robin
Sommerville, a co-founder of F2S; (3) Larry Malone, URR's expert in
hazardous waste management; and (4) Alice Hamilton Rogers, the
Commission's enforcement coordinator. Four reports written by the
Bureau of Economic Geology were introduced into the record; they
support the findings related to the salt dome's instability. These
findings were also based on the testimony of Robert Thoms, a civil
engineer testifying as URR's expert in the behavior of rock
formations and salt properties. The Bureau reports also support
the findings that fresh groundwater is found adjacent to the
proposed injection wells. Testimony from an oil and gas lease
operator, a petroleum reservoir engineer and a Commission staff
member supports the finding that the use of dynamite to sever oil
and gas well casings posed a risk to the aquifer. Based on our
review of the record we conclude that the findings have reasonable
support in the evidence. Because we can answer both questions of
the Charter Medical test affirmatively, we hold that substantial
evidence supports the agency's order. We overrule the third point
of error.

SEPARATE FINDINGS OF FACT FOR THE HAZARDOUS WASTE


AND WATER QUALITY PERMIT APPLICATIONS


 In its second point of error, URR complains that the
Commission acted in an arbitrary and capricious manner because the
findings of fact only support denial of the four injection well
permits; the final order contains no separate findings of fact to
support the denial of the hazardous waste permit or the water
quality discharge permit. The Commission's order contained the
following conclusions of law:



 3.  The application for injection of liquid wastes into
salt caverns in the Boling Dome salt formation in Wharton
County are inadequate in that the applicant's proposed
methodology for solidification of wastes presents a
threat to fresh groundwater.


 4.  In order to effectuate the policies of the State set
forth in Chapters 26 and 27 of the Texas Water Code; Tex.
Rev. Civ. Stat. Ann. art. 4477-7; the Texas Clean Air
Act, Tex. Rev. Civ. Stat. Ann. art. 4477-5; and all
applicable rules, regulations and orders of the Texas
Water Commission and the Texas Air Control Board, and to
administer all powers described therein, injection well
Permits Nos. WDW-233-1, WDW-233-2, WDW-233-3 and
WDW-233-4 should not be issued.


 5.  In light of Conclusion of Law No. 4, water quality
discharge Permit No. 02784 should not be issued.


 6.  In light of Conclusion of Law No. 4, hazardous waste
Permit No. HW-50135-001 should not be issued.



Finding No. 17 supports the Commission's conclusion that URR failed
to prove that it could adequately protect groundwater in the
process of injecting a hazardous waste slurry into salt domes. 
Having determined that URR did not meet its burden to promote the
policies of the State set forth in the Texas Water Code Chapters 26
and 27, the Solid Waste Disposal Act, and the Clean Air Act, the
Commission denied the four injection well permit applications.
Because it denied the injection well permits, the Commission
concluded that it should not issue the other permits to operate the
surface facility and to collect and store stormwater. URR
complains that this action regarding the other two permits was
arbitrary and capricious. 

 URR relies on the Texas Supreme Court's holding in
Railroad Comm'n v. Alamo Express, 308 S.W.2d 843 (Tex. 1958). In
that case, four separate common carriers applied for the same type
of amendment to their existing certificates, all dealing with
identical commodities. The Railroad Commission allowed three of
the carriers to adopt the record made before the Commission by the
first carrier. Twenty-four other common carriers sued the Railroad
Commission in district court to protest the decisions to grant the
amended certificates. The Supreme Court held that the Commission
had acted arbitrarily by not hearing each carrier's individual
evidence. In each case except the first, the applicants had no
opportunity to cross-examine witnesses or present evidence. 
Moreover, the Commission issued independent orders for the carriers
that adopted the agency record without making findings of fact. 
Id. at 844-45. 

 Alamo Express does not control this case. URR is a
single entity seeking six different permits, all six of which are
necessary to operate the proposed hazardous waste disposal
facility. The Commission consolidated the hearings because the
six permits were interdependent. URR did not object. The
Commission made a single finding of fact describing URR's proposed
operation:


 [URR] has submitted applications to . . . the Texas Water
Commission . . . for permits to authorize (1) the
drilling and leaching of salt in the Boling Salt Dome to
create four salt caverns into which solidified waste will
be placed, (2) the processing and solidification of
hazardous waste to be disposed of within the salt caverns
created, and (3) an uncontaminated stormwater collection
system and retention pond for emergency and firefighting
capabilities with pond overflow to be discharged to an
unnamed ditch, thence to Bee Tree Bayou, thence to the
San Bernard River, [etc.] . . . .



In this age of environmental consciousness, most industrial
entities must obtain several permits to implement a single waste
disposal operation.

 URR argues that the Commission acted arbitrarily when it
denied the two other permits without separately listing underlying
facts supporting that decision. We disagree. URR's failure to
prove that it could protect groundwater resulted in the denial of
the injection well permits. If it could not inject the slurry
created by the surface waste facility into the salt caverns for
storage, URR had no need for the other two permits. The injection
wells were essential to URR's proposed waste facility. The
Commission's refusal to issue permits on a piecemeal basis was not
arbitrary or capricious.

 Moreover, we have held previously that the Solid Waste
Disposal Act, in the version applicable here, does not require the
Commission to find any particular ultimate fact or consider any
particular criterion before issuing a hazardous waste permit;
consequently, APTRA § 16(b), as construed by the Supreme Court in
Charter Medical, does not require that the agency state the
underlying facts upon which it reached its final decision. County
of Galveston v. Texas Dep't of Health, 724 S.W.2d 115, 125-6 (Tex.
App. 1987, writ ref'd n.r.e.). Chapter 26 of the Texas Water Code
requires the agency to consider past performance and compliance
with existing permits and other matters not material here. Tex.
Water Code Ann. § 26.0281, § 26.030 (1988). Under the holding in
Charter Medical, APTRA 16(b) does not require a statement of
underlying facts to support the denial of the water quality permit. 
We overrule the second point of error. 


SOLIDIFICATION STANDARD 



 In its fourth and fifth points of error URR complains
that: (1) the Commission substituted a new standard for
solidification of hazardous waste in place of the existing "paint-filter test"; and (2) the Commission failed to give URR notice of
the new standard. Appellant further contends that these actions
violated constitutional and statutory provisions and procedures.
See APTRA § 19(e)(1, 3 & 4) (Supp. 1991).

 While the permit applications were pending before the
Commission, Congress banned the disposal of liquid hazardous wastes
in landfills and salt caverns. 42 U.S.C. § 6924 (b) & (c) (Supp.
1991). To implement this congressional ban, the Environmental
Protection Agency ("the EPA") promulgated a rule requiring owners
and operators of land treatment and disposal facilities to
demonstrate the absence of free liquids in a waste stream by using
the "paint-filter test." 40 C.F.R. 264.314, 50 Fed Reg. 18,370. 
"Free liquids" are those which readily separate from the solid
portion of a waste under ambient temperature and pressure. 40
C.F.R. § 260.10; 31 T.A.C. § 335.1 (1989). The Commission adopted
the paint-filter test for landfills. T.A.C. § 335.175 (1989). URR
presented the Commission with an EPA memorandum suggesting that the
paint-filter test could be used to demonstrate the absence of free
liquids in waste streams to be injected in salt caverns.

 URR correctly states that an applicant proposing to
dispose of hazardous waste in a salt cavern must demonstrate the
ability to pass the paint-filter test. But URR is incorrect in
contending that the paint-filter test was the only standard that
the Commission required URR to satisfy with respect to the storage
of hazardous waste. URR claims that the Commission set forth a new
solidification standard when, on July 6, 1989, Chairman Wynne
stated that the issue before the Commission was, "whether the
solidified material, will . . . stay solid and, . . . whether once
solidified, any of the hazardous materials that are bound up will
then subsequently become available to the environment." URR
asserts that this new standard was the basis of the order, citing
sub-findings 17(b) and (m): 


 (b) The Bureau of Economic Geology has expressed guarded
concern regarding the structural and hydrologic stability
of salt domes for storage of hazardous waste, unless it
is adequately demonstrated that solidification of wastes
will be achieved. [Official Notice Exh. 15-A, 15-B, 15-C] Salt caverns are a viable depository for hazardous
waste if delayed solidification of injected wastes can be
achieved. 


 (m) No tests which would determine the amount, if any of
hazardous waste available to the environment from the
solidified mixture were performed.



(Final Order, August 11, 1989, emphasis added.) Had the Commission
relied solely on the paint-filter test, URR argues that the
Commission would have approved its applications.

 URR mischaracterizes the paint-filter test as the only
requirement to be satisfied to obtain an injection well permit. 
The paint-filter test is a federal regulatory standard that
reflects the federal ban on placing liquid hazardous waste in a
landfill or salt cavern. To obtain injection well its permits, URR
also had to demonstrate that it could protect fresh groundwater. 
Tex. Water Code Ann. § 21.051 (a)(3) (1988). URR had the burden of
proof before the Commission. 31 T.A.C. § 265.2 (1989). Sub-finding 17 (b) & (m) state that URR did not meet its burden of
proof. Sub-finding (b) cites a study conducted by the Bureau of
Economic Geology examining the use of Texas salt domes as a
potential site for permanent storage, in which the Bureau
recommends that waste material stored in a salt cavern must be
solidified and must maintain a strength and density equivalent to
or greater than salt to enhance the stability of the salt dome.

 Under its statutory mandate to protect fresh groundwater,
the Commission must be concerned with the long-term stability of
hazardous waste slurry and its strength and integrity after
injection. URR admits that by passing the paint-filter test it had
not demonstrated its ability to protect fresh groundwater. We
conclude that in addition to the federally mandated paint-filter
test, the Commission could require additional assurances of the
structural integrity of the waste after injection and its long-term
stability in the dome to meet the state mandate for protecting
groundwater. The Commission did not violate statutory or
constitutional provisions, and did not use unlawful procedures when
it required URR to prove that the solidified material would stay
solid in the cavern and not become available to the environment. 

 URR argues that "parties must be able to know what is
expected of them in the administrative process." Starr County v.
Starr County Indus. Serv., Inc., 584 S.W.2d 352, 356 (Tex. Civ.
App. 1979, writ ref'd n.r.e.). We believe that URR had notice that
it must prove its hazardous waste slurry would solidify in a manner
that would not threaten fresh groundwater. Tex. Water Code Ann.
§ 21.051 (2)(3) (1988). Chap. 27 Water Code. This requirement
imposed by that state did not constitute a new solidification
standard. We do not need to address the notice issue raised by
URR. 

 We overrule URR's fourth and fifth points of error and
affirm the trial court's judgment.


 

 Bea Ann Smith, Justice

[Before Chief Justice Carroll, Justices Jones and B. A. Smith]

Affirmed

Filed: August __, 1991

[Publish] [Do Not Publish]